IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DANIEL J. ABBRUZZESE,              )
                                   )
        Plaintiff,                 )
                                   )
        vs.                        )    Civil Action No. 10-705
                                   )
MICHAEL J. ASTRUE,                 )
Commissioner of Social Security,   )
                                   )
        Defendant.                 )

**MEMORANDUM OPINION**

**I.    INTRODUCTION**

Pending before the Court are cross-motions for summary judgment

filed by Plaintiff Daniel J. Abbruzzese and Defendant Michael J.

Astrue, Commissioner of Social Security.    Plaintiff seeks review of

a final decision by the Commissioner denying his claim for disability

insurance benefits ("DIB") under Title II of the Social Security Act,

42 U.S.C. §§ 401 *et seq.*    For the reasons discussed below,

Defendant's motion is denied and Plaintiff's motion is granted

insofar as he seeks remand for reconsideration.

**II.    BACKGROUND**

A.    Factual Background

Plaintiff Daniel Abbruzzese was born on June 4, 1978.

(Certified Copy of Transcript of Proceedings before the Social

Security Administration, Docket No. 6, "Tr.," at 110.)    After

graduating from a vocational high school in 1996, he worked as a welder until May 14, 2002, when he joined the United States Army. (Tr. 31, 129.) He was assigned to the Iraqi theatre where he was an artilleryman, but never suffered any service-related injuries. (Tr. 329.)

On May 30, 2004, after returning to the United States, Mr. Abbruzzese was injured in a head-on vehicle crash at Fort Sill, Oklahoma. He hit his head severely enough to lose consciousness for about 20 hours. (Tr. 253.) The emergency room report reflected that in addition to facial lacerations, Plaintiff complained of pain in his head, left hip and abdomen. He did not experience any problems with vision or hearing at the time. (Tr. 209-211.)

Following the accident, Plaintiff was assigned to desk duty at Fort Sill. Despite ongoing treatment with a variety of medications, he continued to complain of persistent headache, speech problems, memory deficits, and chronic pain in his left knee. (Tr. 234-237.) He also received treatment for depression. (Tr. 284.)

In June 2005, Mr. Abbruzzese underwent an extensive examination by an Army Medical Evaluation Board when he became unable to perform his military duties due to chronic headaches, memory loss, personality change, stuttering and difficulty with hand/eye coordination. (Tr. 706-709.) On December 2, 2005, Plaintiff was honorably discharged from the military and received a 60%

2

service-connected disability stipend, based on post-concussive syndrome with memory deficit and decreased visual depth perception, secondary to the head injury suffered in May 2004. (Tr. 128-141.) After returning to Pennsylvania, he attempted to return to work as a welder for about one month but was unable to continue due to severe and recurrent headaches. (Tr. 283.)

## B. Procedural Background

Plaintiff applied for a period of disability and disability insurance benefits on May 10, 2006, claiming he was unable to work as of December 2, 2005, due to post-concussive head syndrome, seizures and depression. (Tr. 153.) His application was denied at the state agency level on February 22, 2007, the examiner having concluded that although Plaintiff could not perform his past work as welder, there were other less demanding jobs he could do. (Tr. 68, 70-74.) Mr. Abbruzzese sought a hearing before an Administrative Law Judge ("ALJ") which was held by the Honorable John J. Mulrooney II on April 8, 2008. On April 21, 2008, Judge Mulrooney issued his decision, again denying benefits inasmuch as he found Plaintiff could perform a limited range of unskilled, light work despite his impairments. (Tr. 48-63.) The Social Security Appeals Council declined to review the ALJ's decision on April 8, 2010, finding no reason pursuant to its rules to do so. (Tr. 36-40.) Therefore, the April 21, 2008 opinion became the final decision of

3

the Commissioner for purposes of review. 42 U.S.C. § 405(h); Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005), *citing* Sims v. Apfel, 530 U.S. 103, 107 (2000). Plaintiff filed suit in this Court on May 21, 2010, seeking judicial review of that decision.

### C. Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the plaintiff resides.

## III. **STANDARD OF REVIEW**

The scope of review by this Court is limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Findings of fact by the Commissioner are considered conclusive if they are supported by "substantial evidence," a standard which has been described as requiring more than a "mere scintilla" of evidence, that is, equivalent to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, id. at 401.

4

"A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake *de novo* review of the decision and does not re-weigh the evidence presented to the Commissioner. Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006), *citing* Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986) (the substantial evidence standard is deferential, including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.) If the decision is supported by substantial evidence, the Court must affirm the decision, even if the record contains evidence which would support a contrary conclusion. Panetis v. Barnhart, CA No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), *citing* Simmonds v. Heckler, 807 F.2d 54, 58 (3d Cir. 1986), and Sykes v. Apfel, 228 F.3d 259, 262 (3d Cir. 2000).

## IV. **LEGAL ANALYSIS**

### A. The ALJ's Determination

In determining whether a claimant is eligible for a period of disability and to receive disability insurance benefits, the burden is on the claimant to show that he has a medically determinable physical or mental impairment (or combination of such impairments)

5

which is so severe he is unable to pursue substantial gainful employment [1] currently existing in the national economy. The impairment must be one which is expected to result in death or to have lasted or be expected to last not less than twelve months. 42 U.S.C. § 1382c(a)(3)(C)(i); Morales v. Apfel, 225 F.3d 310, 315-316 (3d Cir. 2000). A claimant seeking DIB must also show that he contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he was last insured. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a). The Commissioner does not dispute that Mr. Abbruzzese satisfied the first two non-medical requirements, and the parties do not dispute the ALJ's finding that Plaintiff's date last insured will be March 31, 2011. (Tr. 50.)

To determine a claimant's rights to DIB,[2] the ALJ conducts a formal five-step evaluation:

(1) if the claimant is working or doing substantial gainful activity, he cannot be considered disabled;

(2) if the claimant does not suffer from a severe impairment or combination of impairments that significantly limits his ability to do basic work activity, he is not disabled;

---

[1] According to 20 C.F.R. § 404.1572, substantial employment is defined as "work activity that involves doing significant physical or mental activities." "Gainful work activity" is the kind of work activity usually done for pay or profit.

[2] The same test is used to determine disability for purposes of receiving either DIB or supplemental security income benefits. Burns v. Barnhart, 312 F.3d 113, 119, n.1 (3d Cir. 2002). Therefore, courts routinely consider case law developed under both programs.

(3)   if the claimant does suffer from a severe impairment which meets or equals criteria for an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;

(4)   if the claimant retains sufficient residual functional capacity ("RFC")[3] to perform his past relevant work, he is not disabled; and

(5)   if, taking into account the claimant's RFC, age, education, and past work experience, the claimant can perform other work that exists in the local, regional or national economy, he is not disabled.

20 C.F.R. § 404.1520(a)(4); *see also* Morales, 225 F.3d at 316.

In steps one, two, and four, the burden is on the claimant to present evidence to support his position that he is entitled to Social Security benefits, while in the fifth step the burden shifts to the Commissioner to show that the claimant is capable of performing work which is available in the national economy.[4] Sykes v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000).

Following the prescribed analysis, Judge Mulrooney noted at step one that in 2006, Mr. Abbruzzese had attempted to return to work

---

[3]   Briefly stated, residual functional capacity is the most a claimant can do despite his recognized limitations. Social Security Ruling 96-9p defines RFC as "the individual's maximum remaining ability to perform work on a regular and continuing basis, i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule."

[4]   Step three involves a conclusive presumption based on the listings, therefore, neither party bears the burden of proof at that stage. Sykes, 228 F.3d at 263, n.2, *citing* Bowen v. Yuckert, 482 U.S. 137, 146-147 n.5 (1987).

as a welder for an average of 20 hours a week.  Based on his limited

earnings and his testimony at the hearing that he was unable to

perform this job on either a part-time or full-time basis, the ALJ

concluded this was an unsuccessful work attempt and, consequently,

Plaintiff had not engaged in substantial gainful activity since his

alleged disability onset date of December 2, 2005.  (Tr. 50.)

Resolving step two in Plaintiff's favor, the ALJ concluded Mr.

Abbruzzese suffered from seizure disorder and post-concussive

chronic migraine headaches secondary to a history of a closed head

injury; tinnitus; a history of a left knee injury; cognitive disorder

secondary to traumatic brain injury; adjustment disorder; and a

history of polysubstance and alcohol abuse.  He concluded all of

these were "severe"[5] as that term is defined by the Social Security

Administration.  Although the medical record showed Plaintiff had

also been diagnosed with a congenital foot deformity (pes planus or

flat feet) as well as a history of gastroenteritis and

gastroesophageal reflux disease, Judge Mulrooney concluded these

---

[5] *See* 20 C.F.R. §§ 404.1520(c), 404.1521(a), and 140.1521(b), stating that
an impairment is severe only if it significantly limits the claimant's
"physical ability to do basic work activities," i.e., "abilities and
aptitudes necessary to do most jobs, including, for example, walking,
standing, sitting, lifting, pushing, pulling, reaching, carrying or
handling," as compared to "a slight abnormality" which has such a minimal
effect that it would not be expected to interfere with the claimant's
ability to work, regardless of his age, education, or work experience.
Yuckert, 482 U.S. at 149-151.  The claimant has the burden of showing that
the impairment is severe.  Id. at 146, n.5.

8

conditions were not severe, based on the limited medical treatment Plaintiff had received, the fact that he did not allege disability due to any of them, and the lack of testimony from Mr. Abbruzzese as to any limitations he experienced as a result of these impairments. (Tr. 51.)

At step three, the ALJ reviewed Listings 1.00 (musculoskeletal system), 2.00 (special senses and speech), and 11.00 (neurological system) and concluded the objective medical evidence did not establish that his conditions met or equaled the criteria of any sub-section of those three Listings, whether considered singly or in combination. (Tr. 51.) He then thoroughly reviewed the medical evidence pertaining to Listings 12.02 (organic brain disorders), 12.04 (affective disorders), and 12.09 (substance additional disorders), and concluded again that Plaintiff's degree of impairment was not so severe as to meet the criteria of any Listing, in particular, 12.04. (Tr. 51-54.) The ALJ did note, however, that Plaintiff experienced moderate difficulties in his social functioning, concentration, persistence and pace. These limitations were subsequently incorporated into work-related functions in the ALJ's determination of Plaintiff's residual functional capacity assessment. (Tr. 54.)

The ALJ concluded at step four that Mr. Abbruzzese
has the residual functional capacity to perform light

work. . .except he must avoid all balancing, climbing on ladders, ropes and scaffolds, as well as exposure to excessive vibration or machinery and unprotected heights, or more than occasional pushing and pulling with the lower left extremity, is limited to occupations requiring no more than simple, routine, repetitive tasks, not performed in a fast-paced production environment, involving only simple, work-related decisions, and in general, relatively few work place changes, is limited to occupations which require no more than occasional interaction with supervisors and coworkers and no interaction with members of the general public, is limited to occupations which do not require fine hearing capability or the need to converse over loud background noise, and which do not involve the handling, sale or preparation of alcoholic beverages or access to narcotic drugs and which are not in the medical field.

(Tr. 54-55.)

In arriving at this RFC assessment, the ALJ reviewed in detail Plaintiff's medical records from 2004 through the date of the hearing, a questionnaire about his activities of daily living ("ADL questionnaire"), medications and their side effects, hospitalization records, earnings record, testimony, medical opinion evidence, and the fact that Plaintiff had been discharged from the Army as partially disabled. (Tr. 55-61.)

At the hearing, Mitchell Schmidt, a vocational expert ("VE"), had testified that Plaintiff's previous work as a welder and soldier (specifically a rocket launcher) were both medium exertion, semi-skilled positions. (Tr. 61; see also Tr. 31.) However, the ALJ concluded Plaintiff could not return to his past relevant work due to his non-exertional impairments which limited him to no more

10

than simple, routine, repetitive tasks and his limitation to light work.[6] (Tr. 20-21.) Mr. Schmidt further testified, in response to the ALJ's hypothetical question, that Plaintiff could perform the representative occupations of a shipping and receiving weigher, garment sorter, and folder, each of which was light, unskilled work. (Tr. 62, *see also* Tr. 32.) Accordingly, considering his age,[7] high school education, work experience, and RFC, the ALJ determined at step five that Mr. Abbruzzese was not disabled at any time between December 2, 2005, and the date of his decision. Consequently Plaintiff was not entitled to benefits. (Tr. 62-63.)

## B. Plaintiff's Arguments

In his brief in support of the motion for summary judgment (Doc. No. 9), Mr. Abbruzzese concentrates on the ALJ's omission of any detailed analysis of the frequency, severity, duration, and "practical ramifications" his migraine headaches have on his ability

---

[6] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities." 20 C.F.R. § 404.1567(b). A person who is able to do light work is also assumed to be able to do sedentary work unless there are limiting factors such as loss of fine dexterity or the inability to sit for long periods of time. Id.

[7] Plaintiff was 27 on his alleged disability onset date and is thus considered by the Social Security Administration to be a "younger individual." 20 C.F.R. § 404.1563.

11

to work on a sustained basis. Because of that alleged omission, the hypothetical question posed by the ALJ to the Vocational Expert was incomplete and the VE's response thereto cannot be considered substantial evidence on which the ALJ could rely in arriving at his conclusion that Mr. Abbruzzese was not disabled. Since Plaintiff does not argue that the ALJ erred in his analyses and conclusions regarding the remaining medical evidence, our discussion below mentions his other conditions only in passing. We begin with a summary of the ALJ's references to Plaintiff's headaches in his decision.

## C. The ALJ's Discussion of Plaintiff's Migraine Headaches

Contrary to Plaintiff's argument, Judge Mulrooney did refer in detail to Mr. Abbruzzese's chronic migraine headaches throughout his decision. First, in step two of his analysis, he concluded, based on the medical evidence, that Plaintiff suffered from a combination of severe impairments, including "post-concussive chronic migraine headaches secondary to a history of closed head injury" which was "not slight and [has] more than a de minimus effect on the claimant's ability to perform basic work activities." (Tr. 50-51.)

In ascertaining Plaintiff's residual functional capacity at step four, the ALJ evaluated Plaintiff's symptoms, including headache pain. (Tr. 55-61). He noted that

once an underlying physical. . .impairment that could reasonably be expected to produce the claimant's pain or

other symptoms has been shown, I must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit [his] ability to do basic work activities. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, I must make a finding on the credibility of the statements based on a consideration of the entire case record.

(Tr. 55.) This is a correct and complete statement of the actions the ALJ must take pursuant to Social Security regulations. *See* Social Security Ruling[8] 96-7p, "Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements."

The ALJ then noted the following:

- Plaintiff's application for disability benefits indicated he was limited in his ability to work because he had "severe headaches," that is, "migraine headaches with loud noise or increased light." (Tr. 55.)

- In October 2006, Mr. Abbruzzese had reported in the ADL questionnaire that he was experiencing "constant and severe pain in his head," that the pain "radiated into the neck and back" and "regularly affected his sleep and. . .his ability to think and concentrate." He could not walk more than a quarter of a mile before he had to stop due to "extreme pain in his head."[9] (Tr. 55.)

---

[8] Social Security Rulings are agency rulings published "under the authority of the Commissioner of Social Security" and "are binding on all components of the Social Security Administration." 20 C.F.R. § 402.35(b)(1); Sykes, 228 F.3d at 271. "Rulings do not have the force and effect of the law or regulations but are to be relied upon as precedents in determining other cases where the facts are basically the same. A ruling may be superseded, modified, or revoked by later legislation, regulations, court decisions or rulings." Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984).

[9] The ALJ slightly misread this comment. Plaintiff actually reported that he can walk without stopping only about "1/4 of a mile because I get light headed and extreme pain in left knee." (Tr. 162.)

13

- In an undated disability report submitted sometime after March 1, 2007, [10] Plaintiff reported that he experienced "stomach sickness and 'bad' migraine headaches if he did anything." (Tr. 56.)

The ALJ stated that although he found Mr. Abbruzzese's "medically determinable impairments could reasonably be expected to produce the alleged symptoms,. . .the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment." (Tr. 56.) He elaborated on the evidence related to Plaintiff's head injury and his subsequent complaints of chronic headaches as follows:

- After the motor vehicle accident in May 2004 in which he experienced a closed head injury and loss of consciousness, Mr. Abbruzzese complained of headaches; however, a computed tomograph scan of the brain at the time showed no acute intracranial traumatic fossa and no bony trauma. (Tr. 56.)

- He reported headaches in January 2005, but they "were not considered to be post-traumatic in nature because they did not occur immediately after the motor vehicle accident. (Id., citing Exhibit 2F.) [11] Although he was subsequently

---

[10]    The Court derives this date from the fact that Plaintiff reported he had been diagnosed with depression and post traumatic stress syndrome after March 1, 2007. (Tr. 188.)

[11]    Again, the ALJ may have misread the medical evidence. On January 25, 2005, Bridget Keller, a neurologist, noted that "I do consider [his headache] to be post-traumatic in nature although it is somewhat unusual that it did not occur immediately after head injury. I will obtain [an] MRI . . .to [rule out] subtle pathology." (Tr. 270-271.)

      The Court notes for the record that Social Security regulations recognize that traumatic brain injury ("TBI") "may result in neurological and mental impairments with a wide variety of posttraumatic symptoms and signs. The rate and extent of recovery can be highly variable and the long-term outcome may be difficult to predict in the first few months

14

diagnosed with post-concussive syndrome, neurological exams were "unremarkable," revealing "normal motor, reflexes, sensation, coordination, cerebellar, and gait," and MRI imaging performed in February 2005 was equally "unremarkable." (Tr. 56.)

- After his discharge from the Army and return to Western Pennsylvania, Plaintiff continued to report chronic daily headaches for which he had been prescribed Imitrex.[12] He underwent a consultative evaluation by Dr. Kathy L. Gardner, a neurologist on December 12, 2006. He reported to Dr. Gardner that he had not taken medication for headaches during the previous three months. The neurological examination was essentially unremarkable, and he was diagnosed with chronic daily headaches. Objective tests performed in November 2006 (an MRI of the brain) and in January 2007 (an electroencephalogram) were normal. (Tr. 56.)

- In September 2007, Dr. Gardner again examined Plaintiff and reiterated her diagnosis of chronic post-traumatic headaches. Mr. Abbruzzese reported in February 2008 that he was experiencing two to three severe headaches a week that lasted four to five hours; however, another neurologist, Dr. Sasa Zivkovic, reported intact cranial nerves, normal motor strength and coordination, unremarkable sensation, and a normal gait. (Tr. 57.)

The ALJ later summarized Plaintiff's medications for his headaches, noting that he had been prescribed Zomig[13] 20 mg in June

---

post-injury. Generally, the neurological impairment(s) will stabilize more rapidly than any mental impairments(s). Sometimes a mental impairment may appear to improve immediately following TBI and then worsen, or conversely, it may appear much worse initially but improve after a few months." Listing 11.00F.

[12] Imitrex (sumatriptan) is a selective serotonin receptor agonist used to treat the symptoms of migraine headaches; it does not prevent migraine attacks. *See* the drugs and supplements catalog on the website maintained by the National Institute of Medicine at www.nlm.nih.gov/medlineplus (last visited December 3, 2010), "Medline Plus."

[13] Zomig is a brand name for zolmitriptan to be taken orally. Like Imitrex, it is a selective serotonin receptor agonist which treats the

2004, which did not relieve his pain. (Tr. 59.) He noted, however, that when Plaintiff completed the ADL questionnaire in October 2006, he had been taking this medication for almost two and a half years, indicating to the ALJ it had been "at least marginally effective in controlling his headaches." (Tr. 59.) On the undated disability appeal report from 2007 (Tr. 187-192), Plaintiff reported he was not taking any medication,[14] and in August 2007, he stated he was taking two medications, Imitrex and Inderal,[15] "since 2004 indicating these medications have been effective in relieving the claimant's headaches or controlling his headaches to the point he has been functional." (Id.) At the time, he was also taking Depakote and amitriptyline[16] for his seizures as well as migraine headaches. Although Mr.

___

symptoms of migraine such as upset stomach and sensitivity to sound and light. It reduces the swelling of blood vessels around the brain and blocks release of chemicals which cause the symptoms. It does not prevent migraine attacks. See drugs and supplements at Medline Plus.

[14] This appears to be an omission in completing the form since the medical evidence is clear that throughout 2007, Mr. Abbruzzese was prescribed amitriptyline, Depakote and Imitrex. (Tr. 643, notes from May 7, 2007 and Tr. 637, notes from September 4, 2007.) The Court has been unable to find any medical evidence which suggests he was not taking the medication as prescribed at that time.

[15] Inderal (propranolol) is chiefly prescribed to treat high blood pressure and other heart or circulatory conditions. However, it has also been used to reduce the severity and frequency of migraine headaches. See www.drugs.com/inderal.html, last visited December 3, 2010.

[16] Depakote (valproic acid) is used to treat epileptic seizures and to help prevent migraine headaches. Amitriptyline (brand name Elavil) is used primarily to treat symptoms of depression and to prevent migraine headaches. See drugs and supplements at Medline Plus.

16

Abbruzzese testified that taking Depakote and Imitrex made him sleepy, [17] the medical evidence did not reveal reports of "significant or debilitating side effects" of his medications; moreover, the fact that he had been taking Imitrex since 2004 indicated to the ALJ that it was not producing any such side effects. (Tr. 59.)

The ALJ further noted that although Plaintiff received medical treatment through the Veterans Administration hospital system since November 2006, he was not frequently treated by a specialist such as a neurologist for his headaches, [18] there was no evidence in the record that he had been hospitalized or been treated in an emergency room for headaches, [19] nor had he been referred to a pain management clinic or to a psychiatrist or psychologist to help him cope with the pain. (Tr. 59-60.)

---

[17] Plaintiff testified that he gets severe migraine headaches about three times a week. When he feels a headache coming on, he takes his medication, Depakote and Imitrex nasal spray, then falls asleep. (Tr. 21, 29.) Since 2004, some medications have helped the headaches but his physicians "keep changing stuff" to find the right combination of medications to reduce his headaches to one or two a week. (Tr. 28.)

[18] In fact, Drs. Keller, Gardner, and Zivkovic are all neurologists who treated Plaintiff for his headaches. After he returned to Pittsburgh and began receiving treatment through the Veterans Administration, he was seen approximately every three months for this condition.

[19] Actually, there is evidence that during the period in which Plaintiff was making the transition from Oklahoma after his discharge in December 2005 and November 2006 when he began treatment in the Pittsburgh area, he had made three "ECC visits" in three months after his medications ran out and had he received "IM [intramuscular] medications for migraine control." (Tr. 277.) The records from the emergency visits do not appear in the record.

17

D.   Analysis

Both the ALJ and Defendant in his brief in support of his motion for summary judgment (*see* Doc. No. 11, "Def.'s Memo," at 10) comment on the fact that all the objective tests – MRIs, CT scans, and electroencephalographs – were essentially negative.  This is not surprising since according to the medical literature, migraine headaches cannot be detected by imaging techniques, laboratory tests, or physical examination, but are linked to disturbances in cranial blood flow.  According to the on-line edition of the Merck Manual home edition,

> Doctors diagnose migraines when symptoms are typical and results of a physical examination (which includes a neurologic examination) are normal.  No procedure can confirm the diagnosis.  If headaches have developed recently or if the pattern of symptoms has changed, computed tomography (CT) or magnetic resonance imaging (MRI) of the head may be done to exclude other disorders.

*See* www.merckmanuals.com/home (search for "migraine headaches.")

This is consistent with Dr. Keller's comment in January 2005 that she would order an MRI to "rule out subtle pathology" as a cause for his headaches.  (Tr. 271.)

Moreover, in the medical evidence, Plaintiff's headaches are described as "left posterior occipital throbbing,. . . worse in the afternoon and evening."  (Tr. 406.)  He

> reports that he has a headache every day, awakens with it and goes to sleep with it.  The least painful time is usually right before he goes to bed, after he has taken his amtriptyline, when the pain is about a 2/10.  Three

18

or 4 days out of the week, he will develop a much worse headache, an 8/10 in intensity, with photophobia, phonophobia, nausea, vomiting and lightheadedness. He reports that these headaches come more frequently with activity. He also reports that he cannot see straight; he cannot do anything and has to lay [sic] down. The pain he describes is a constant pressure on the left side of his head with a throbbing component that feels like "someone is stepping on my head." He also reports that the pain is worse when he stands up or when he is in the heat.

(Tr. 653.)

According to the Merck Manual, these symptoms are consistent with migraine headaches. ("A migraine headache is a pulsating or throbbing pain that usually ranges from moderate to severe. It can affect one or both sides of the head. It is worsened by physical activity, light, sounds, or smells and is accompanied by nausea, vomiting, and sensitivity to sounds and light.") "Because there is no test for migraine headaches, 'when presented with documented allegations of symptoms which are entirely consistent with the symptomatology for evaluating the claimed disorder, the [Commissioner] cannot rely on the ALJ's rejection of the claimant's testimony based on the mere absence of objective evidence.'" Federman v. Chater, CA No. 95-2892, 1996 U.S. Dist. LEXIS 2893, *6 (S.D.N.Y. Mar. 11, 1996), quoting Fragale v. Chater, 916 F.Supp. 249, 254 (W.D.N.Y. 1996).

Defendant raises several other arguments in his brief, contending that the record supports the ALJ's conclusions regarding

19

Plaintiff's chronic headaches. First, the ALJ accounted for the headaches by restricting Plaintiff to a limited range of light work. (Def.'s Memo at 2.) However, the only limitation which can be even vaguely considered an accommodation for Plaintiff's headaches is the exclusion of work in any environment which requires "fine hearing capability or the need to converse over loud background noise." (Tr. 55.) This seems to be a limitation more closely tied to Plaintiff's reported tinnitus rather than to an effort to eliminate a precipitating factor for his migraine headaches. Mr. Abbruzzese's medical evidence and ADL questionnaire confirm that loud noise (such a running a vacuum cleaner or lawn mower) and physical exertion can cause the onset of a migraine headache. (Tr. 161, 659.)

Defendant argues that Plaintiff's own statements contradict his position that he is unable to perform even a limited range of light work. For example, on September 4, 2007, when Plaintiff assessed his pain level as 4 on a scale of 1 to 10, a level that was acceptable to him, Dr. Gardner wrote that "it sounds as if he is either doing better with the headaches or not noticing them as much." Defendant argues that therefore, his headaches were reasonably controlled by treatment or medication and cannot be considered disabling. (Def.'s Memo at 10, *citing* Tr. 406-407.) Defendant fails to note, however, that at the same consultation, Dr. Gardner increased his amitriptyline dosage from 50 to 100 mg a day and his Depakote from

20

500 to 1000 mg a day, a step which would appear to contradict the conclusion that his headaches were "reasonably controlled." (Tr. 406.)

Next, Defendant argues that Plaintiff's "extensive activities belie his claim of debilitating and disabling headaches." (Def.'s Memo at 11, listing activities from Plaintiff's testimony and his ADL questionnaire.) However, Plaintiff's headaches, according to the medical record and his testimony, occur two or three times a week for four or five hours at a time. One can logically infer that when he is not experiencing a severe headache, he can perform normal tasks. The problem is the headaches are episodic, thus affecting his ability to work on a regular, sustained basis.

The standard by which the ALJ is to weigh a claimant's subjective symptoms requires him to consider all the medical evidence in the record which could support such claims. An ALJ must "give serious consideration to a claimant's subjective complaints of pain, even where those complaints are not supported by objective evidence." Mason, 994 F.2d at 1067, *citing* Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir. 1985). But when the claimant provides medical evidence supporting his complaints of pain, the "complaints should then be given great weight and may not be disregarded unless there exists contrary medical evidence." Mason, 994 F.2d at 1067-68; Witmer v. Barnhart, CA 01-3061, 2002 U.S. Dist. LEXIS 5559, *10-*11 (E.D. Pa.

Mar. 28, 2002), *citing* Smith v. Califano, 637 F.2d 968, 971 (3d Cir. 1981). Even if alleged pain is more severe or persistent than would be expected, the ALJ must consider all evidence relevant to subjective pain. Sykes, 228 F.3d at 266, n.9. Although Judge Mulrooney summarized Plaintiff's medical record concerning his migraine headaches accurately and in detail, he never explained why he found Plaintiff's description of the severity of this impairment less than credible and discounted the effect it would have on Mr. Abbruzzese's ability to work on a sustained basis, The blanket statement that Plaintiff's testimony and his reports of the intensity, persistence and limiting effects of his headaches were " not credible to the extent they are inconsistent with the residual functional capacity assessment" (Tr. 56) is insufficient; the ALJ must explain why he found them not credible and do so in sufficient detail that a reviewing court can readily discern his reasoning. Burnett v. Commissioner of SSA, 220 F.3d 112, 122 (3d Cir. 2000).

Moreover, in determining a claimant's RFC, the ALJ is required to consider the effect of all impairments which he determines at step two to be "severe." Cadillac v. Barnhart, No. 03 2137, 2003 U.S. App. LEXIS 24888, *11-*12 (3d Cir. Dec. 10, 2003), *citing* 20 C.F.R. § 404.1526(a) (in assessing eligibility for benefits, the Commissioner "will consider the combined effect of all. . . impairments without regard to whether any such impairment, if

22

considered separately, would be of sufficient severity.") With the exception of the reference to "background noise" which we find marginally applicable, the Court can discern no limitations stemming from Plaintiff's medically documented chronic migraine headaches in the ALJ's description of Mr. Abbruzzese's residual functional capacity.

Consequently, we agree with Plaintiff's related argument, i.e., that the ALJ failed to include any limitations stemming from his migraine headaches when posing the hypothetical question to the Vocational Expert at the hearing. The question asked the VE to assume an individual with Mr. Abbruzzese's education, training and work experience and the following additional limitations:

- Light range of work as defined in the regulations;

- No balancing, climbing of ladders, ropes or scaffolds, or exposure to excessive vibration, dangerous machinery, or unprotected heights;

- No more than occasional pushing or pulling with the lower left extremity;

- Occupations which require no more than simple, routine, repetitive tasks not performed in a fast-paced production environment, only simple work-related decisions and relatively few workplace changes;

- Occupations which require no more than occasional interaction with supervisors and co-workers and no interaction with members of the public;

- Occupations which do not require fine hearing capability or the need to converse over loud background noise; and

- Occupations which do not involve the handling, sale or

preparation or alcoholic beverages, access to narcotic
drugs, and which are not in the medical field.

(Tr. 31-32.)

As noted above, we find nothing in this set of limitations which
would take into consideration the precipitating factors for Mr.
Abbruzze's migraine headaches, e.g., loud noise, bright light or
continual physical activity.

When Plaintiff's counsel inquired of the Vocational Expert what
amount of time an employee might be able to be off from work, either
in terms of breaks, time off task or absences, the VE testified that
for unskilled light work such as that he had previously identified,
the employee would be expected to be at work eight hours a day, five
days a week, with two fifteen-minute breaks and a half-hour lunch
break each day. If an employee required more than two days' absence
from work in an average month, he could not be expected to sustain
competitive employment. (Tr. 33.) The medical evidence supports
Plaintiff's claims that he experiences debilitating migraine
headaches two or three times a week, and there is no medical evidence
to contradict this testimony.

A proper hypothetical question must reflect "all of a claimant's
impairments that are supported by the record" in order for the
response by the vocational expert to be considered substantial
evidence. Page v. Barnhart, No. 03-4122, 2004 U.S. App. LEXIS 18558,
*8 (3d Cir. Sept. 2, 2004), *quoting* Chrupcala v. Heckler, 829 F.2d

24

1269, 1276 (3d Cir. 1987). Here, Plaintiff's complaints of disabling migraines are well supported by the record and there is no medical evidence that the Court can discern which questions those complaints.[20] Therefore, the ALJ's question posed to the vocational expert was incomplete. See Page, id., citing Burns v. Barnhart, 312 F.3d 113, 123 (3d Cir. 2002) (question posed to the vocational expert must include all impairments supported by "medically undisputed evidence" in the record).

## V. FURTHER PROCEEDINGS

Under 42 U.S.C. § 405(g), a district court may, at its discretion, affirm, modify or reverse the Secretary's final decision with or without remand for additional hearings. However, the reviewing court may award benefits "only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the plaintiff is

---

[20] The ALJ and Defendant both remark about reports of malingering, Plaintiff's abuse of drugs and alcohol, and inconsistent histories given to physicians about his hospitalization following the accident. The Court agrees there is a single reference to malingering which occurred in 2005 (see Tr. 221-223), and that at various times Plaintiff reported to physicians that he was unconscious for two or three days (rather than 20 hours as reflected in the medical notes) and that he was hospitalized for a week (rather than only 3 days.) While the ALJ properly considered these inconsistencies in arriving at his credibility determination, we were unable to find any reference to malingering in medical notes following his discharge in December 2005, and no physician questioned his reports pertaining to migraine headaches. If the ALJ were concerned that Plaintiff's drug and alcohol abuse were contributing factors to his disability, the Social Security Administration has devised a process by which the ALJ is to analyze those factors. See Ford v. Barnhart, No. 03-1594, 2003 U.S. App. LEXIS 22055, *6-*7 (3d Cir. Oct. 17, 2003), citing 20 C.F.R. § 404.1535.

disabled and entitled to benefits." Krizon v. Barnhart, 197 F. Supp.2d 279, 291 (W.D. Pa. 2002), *quoting* Podedworney v. Harris, 745 F.2d 210, 222 (3d Cir. 1984).

The ALJ in this case has performed an outstanding analysis of the medical information and yet, we are compelled to remand this matter for further consideration. We agree with Plaintiff that the ALJ failed to explain why he rejected Mr. Abbruzzese's testimony and the medical evidence regarding the severity and frequency of his chronic migraine headaches. However, we cannot conclude that Plaintiff is entirely disabled from all substantive gainful activity. We therefore remand for further consideration by the ALJ.

An appropriate order follows.

December ___9___, 2010

William L. Standish
United States District Judge